LANDRY, Judge.
Defendant Canadian Universal Insurance Company (Appellant), excess insurer of Flash Truck Line, Inc. (Flash), appeals judgment awarding plaintiff, Rodney Le-Jeune (Appellee), damages in the sum of $50,000.00 for personal injuries sustained in an accident allegedly caused by the negligence of Flash’s driver whom Appellee was assisting in the unloading of oil field equipment from Flash’s truck, at a well site being reworked by Appellee’s employer Pelican Well Service (Pelican). Judgment was also rendered in favor of Traders and General Insurance Company (Traders) who intervened claiming recovery of workmen’s compensation benefits paid Appellee as Pelican’s insurer. Fidelity and Casualty Insurance Company, Flash’s primary insurer, also made defendant, whose coverage is limited to $10,000.00, has not appealed. Appellee has answered the appeal, requesting an increase in damages. We affirm in all respects.
Appellant urges the following trial court errors: (1) a finding that an accident occurred despite overwhelming evidence that the accident could not have happened in the manner related by Appellee; (2) acceptance of Appellee’s testimony regarding his disability, despite numerous contradictory statements by Appellee that the injury occurred in a fall at Appellee’s home; (3) acceptance of Appellee’s testimony as credible notwithstanding total destruction of his veracity by Appellant’s showing Appellee’s concealment of disabling illnesses and accidents unrelated to Appellee’s employment; and (4) awarding excessive damages.
Appellee and his witnesses, Nellard Brown and James Fontenot (fellow employees), testified that the accident occurred about midmorning, April 16, 1966, at a well being reworked by Pelican in the Valentine Oil Field. Pelican’s crew consisted of Ap-pellee as driller in charge, the above named co-workers and also D. L. Fontenot. Appel-lee was then 41 years of age and had been employed by Pelican for about 6 months. Flash’s truck, driven by its employee Ralph Derrick, delivered some equipment to the drill site, including four or five 30 foot lengths of drill collars measuring 3Vs inches in diameter and each weighing about 400-500 pounds. While assisting Derrick in unloading the drill collars, Appellee allegedly injured his right shoulder.
Suit was filed in April, 1967. Trial was held on three discontinuous days, namely, December 30, 1970, January 11, 1971, and January 21, 1972. On the second trial day, Appellant introduced numerous records of the Veterans Administration (V.A.), indicating Appellee’s hospitalization for illnesses and disabilities, including an application for disability pension for alleged service connected disability. The V.A. records also contained statements inconsistent with those Appellee had previously given concerning his health and general physical condition. These records had not been seen by Appellee’s counsel because they were received by Appellant, in response to subpoena, shortly before the second trial date. Counsel for Appellee requested the matter be held open for his examination of these records, and decision as to whether to depose the V.A. medical staff and employees who compiled the information shown thereon. Thereafter counsel for Appellee advised the court he did not wish to depose the V.A. personnel. This development was followed by Appellant’s request for a third trial date to offer in evidence V.A. records made available to him since the second trial date. The trial court granted the additional date which was set for and held January 21, 1972. The record compiled on the third trial date was lost. After several motions and a contradictory hearing held at Appel-lee’s request, the trial court scheduled a hearing for February 24, 1975, to reconstruct the record of the third trial date. Counsel for Appellant did not appear for the scheduled hearing, apparently due to a misunderstanding as to the date. Neither *298 did counsel advise the court counsel would not be present. Counsel for Appellee moved to close the record because of the failure of Appellant’s counsel to appear. The court ordered the record closed. Subsequently, counsel for Appellant requested and was granted an additional trial date to reconstruct the lost portion of the record. The last trial date was set for and held on March 16, 1976.
On the final trial date, Appellant attempted to introduce evidence concerning issues not originally raised on the initial third day of trial. Appellee objected thereto, especially objecting to additional V.A. records which tended to further impeach Appellee’s veracity and credibility. The trial court sustained Appellee’s objections on the ground that the new evidence exceeded the testimony and evidence offered on the original third day of trial. The court did, however, permit Appellant to offer the evidence and documents and allowed cross-examination of Appellee with respect thereto, by way of proffer. The evidence is before us by way of proffer. It includes, primarily, additional V.A. records of Appellee’s admission to V.A. Hospitals.
Ralph Derrick, driver of Flash’s truck on the day of the accident, was no longer employed by Flash and was unavailable as a witness. Leonard Derrick, brother of Ralph, and part owner of Flash, testifying from company records, verified that a load of equipment including some drill collars, was made to Pelican’s site in the Valentine Oil Field, on the day in question. He stated the alleged accident was not reported by his brother and that he had no knowledge of the incident until demand was made by Appellee’s counsel long after the date in question. He recalled loading the truck, the drill collars being placed in the center of the float or flat bed trailer on which delivery was made. The collars rested on 4 X 4’s laid flat on the float. The collars were held in place by a chain placed around them at each end. A binder equipped with hooks was used to tighten the chains to hold the collars in place during transit. The chains were secured by passing them beneath and fastening them to road rails parallel to each side of the float.
Although he was not present at the unloading, Derrick testified as to the customary manner of unloading. He explained that such loads would be further secured by “pegs” consisting of timbers or iron bars inserted in slots at each of the four corners of the float. He conceded it was the truck driver’s duty to supervise unloading the truck. On arrival at delivery point, the driver would position his truck where the load was to be deposited. He would then release the binders, which did not necessarily release the chains. If the collars did not move, the driver would then release hooks which further secured the chains, and lastly would remove the pegs before prying off the first collar.
It is shown that as a rule a rig is equipped with a nearby pipe rack erected to a height about 1 foot below normal truck bed height. Pipe and drill collars delivered to a rig are simply rolled off the .truck onto the rack. Subject rig, however, did not have a pipe rack. In such instances, it is customary to place boards on the ground, create a ramp by placing boards at the front and rear of the float and roll the pipe or drill collars down the incline onto the boards in lieu of dropping pipe and drill collars directly from truck bed to the ground.
Appellee, Brown and James Fontenot testified in substance that when the truck arrived, Appellee directed Brown and Fon-tenot to assist him and the truck driver in unloading the pipe. Appellee directed Brown and Fontenot to lay boards on the ground and construct a ramp in the manner indicated. They also stated that D. L. Fon-tenot was instructed by Appellee to remain at work on the rig.
Conflict exists between the testimony of Appellee, Brown and Fontenot as to their respective positions at the time of the accident and also as to how the accident occurred. Appellee testified Brown was stooping down on the driver’s side of the trailer, adjusting the boards on the ground, when the truck driver released the chains *299 without warning and the drill collars began rolling down the incline. Appellee yelled to the driver not to release the chains, but to no avail. As the drill collars started to roll, Appellee feared they would injure Brown. Appellee, who was standing near the rear of the float, on the same side as Brown, thrust out his right arm to slow the descent of the collars long enough for Brown to get out of the way, but the weight of the collars put a strain on his right arm and shoulder sufficient to cause the shoulder to hurt and a lump to appear immediately. Appellee yelled that his arm was hurt and immediately walked away from the truck. He did not report the accident to the truck driver. Appellee’s injury was subsequently diagnosed as a tear of the rotator cuff of the right shoulder.
Brown and James Fontenot corroborate Appellee’s testimony to the effect that Ap-pellee yelled to the driver not to release the chains on the pipe; that Appellee did attempt to keep the pipe from rolling off the truck bed; and that Appellee yelled out immediately that his arm was hurt. Their testimony included inconsistencies as to their respective positions. Brown stated Appellee was standing near him at about the center of the float. Appellee’s testimony placed Appellee near the rear of the trailer. Fontenot testified he recalled Ap-pellee at the rear of the truck facing the ends of the drill collars. Fontenot believed the drill collars were not flat on the truck bed but were resting in a slanted position on a pipe rack at the front of the float. Additionally, Brown and Fontenot gave varying accounts of the manner in which Appellee attempted to hold back the collars.
D. L. Fontenot testified he did not see the accident but was told by Appellee that Ap-pellee had hurt his arm while unloading the pipe.
It is conceded that Appellee worked the remainder of the day but did not return to work the next morning.
Appellant suggests the accident could not have happened as related by James Fonten-ot who placed Appellee at the rear of the truck facing the ends of the drill collars. In such a position, it is contended, Appellee could not have extended his arm to support the pipe to keep it from rolling onto Brown. Appellant also suggests it would have been foolish and useless for Appellee to attempt to stop the pipe from rolling by thrusting out his arm because such a gesture could not have delayed the descent of such a heavy load even for a fraction of a second. It is Appellant’s position that Appellee fabricated the accident to take advantage of a shoulder injury previously sustained in a fall at Appellee’s home. Additionally, Appellant maintains that Brown and James Fontenot had no personal knowledge of the incident except what Appellee told them. The record does not support this claim. Brown and James Fontenot testified from personal knowledge, not what Appellee allegedly told them. While their testimony was in some degree conflicting with that of each other and Appellee as well, this circumstance in itself would indicate they had not been couched by Appellee as inferred by Appellant. We note also that trial was held long after the accident. Under such circumstances, it is to be expected that recollections of witnesses may be somewhat confused. Had Appellee fabricated the accident, it would appear he could also have had D. L. Fontenot testify as to actually seeing the incident.
The trial court found the accident did occur; that Ralph Derrick’s negligence in prematurely releasing the chains was the cause thereof; and that Ralph Derrick was at the time acting within the scope and during the course of his employment by Flash. These factual determinations are entitled to great weight and are not to be disturbed on appeal except for a showing of manifest error. Canter v. Koehring Company, 283 So.2d 716 (La.1973). Reasonable evaluations of credibility and reasonable inferences of fact made by a trial court should not be disturbed on appeal, even though the appellate court may feel its own, but different, evaluations and inferences are as reasonable. Canter, above. See also Billiot v. Bourg, 338 So.2d 1148 (La.1976).
*300 The day following the accident, Appellee was seen by Dr. Charles J. Aswell, Appel-lee’s family physician since 1955. Appellee related having injured his right shoulder on some sort of drill collar while at work. Dr. Aswell diagnosed the condition as tear or damage of the ligaments of the right shoulder and hospitalized Appellee from April 17 to April 23, 1966, and continued treatment of Appellee until October, 1966. He continuously prescribed muscle relaxants and pain medication. Dr. Aswell considered Appel-lee totally and permanently disabled to do oil field work. He referred Appellee to Dr. Robert L. Bordelon.
On April 30,1966, Dr. Robert L. Bordelon saw Appellee for the first time. He also saw Appellee May 5 and September 19, 1966, February 10, 1967, and March 20, 1969. On the second visit, Dr. Bordelon suspected that Appellee had a torn rotator cuff of the right shoulder. He deemed the condition serious and felt it would take six months to a year to heal. He was also of the view that surgical intervention might be required eventually.
Appellee was seen by Dr. J. Hugh Larri-viere on February 3,1967, July 31,1967 and March 28, 1969. He recommended conservative treatment for what he considered a dislocated shoulder. He deemed Appellee totally disabled due to pain, numbness in the right arm and shoulder and weakness of grip in the right hand. On Appellee’s last visit he found no improvement in Appellee’s condition over that noted in the initial visit.
Appellee was seen by Dr. John D. Jackson June 13, 1966, July 14, 1966, January 25, 1968, and May 9, 1969. He considered Ap-pellee disabled due to the shoulder injury and felt this condition would continue unless surgery was performed to repair the damaged member.
On October 12, 1970, Appellee was first seen by Dr. George P. Schneider who recorded a history of injury to Appellee’s shoulder in an accident while Appellee was unloading drill collars at work. Dr. Schneider found Appellee unable to work at that time. On October 30, 1970, Dr. Schneider performed surgery intended to prevent Appellee’s shoulder from slipping out of socket, as it had done on numerous occasions. Dr. Schneider believed Appellee might return to work in six months after surgery, but acknowledged that such patients usually experience a 20% to 25% disability because of limitation of rotation and abduction, which is an expected residual of such surgery.
Appellee’s testimony at the first trial date indicated he had been in general good health prior to the accident and had lost little time from work due to illness or accident. He admitted one or more industrial accidents from which no serious injury resulted. He also acknowledged having been involved in prior automobile accidents which caused no appreciable injury. On the second trial date, Appellee acknowledged an operation for thrombophlebitis, which disabled him for five or six weeks.
V.A. records introduced by Appellant show the following: (1) Appellee sustained a severe head injury in an automobile accident which antedated subject accident; (2) Appellee applied for a pension in 1946, shortly after his discharge from military service, predicated on a service connected elbow injury; (3) In a stay from September 27 to September 30,1965, Appellee reported being unemployed since February, 1965, due to swelling in his legs; (4) Hospitalization August 31 through September 7, 1967, for swelling in the legs and thrombophlebitis and a history of blood clots for 12 years, together with surgery consisting of vein ligation and stripping; (5) On admission September 29,1965, Appellee gave a history of varicose veins and weakness in the legs; (6) Hospitalization April 13 through April 22, 1968, with Appellee giving a history of veinous ligation and stripping of both legs in about 1958, and subsequent frequent episodes of inflammation of the legs necessitating bed rest; and (7) Hospitalization April 29, 1968, on which occasion Appellee related the same history given the previous week and was again treated for swelling and pain in both legs.
Confronted with these records, Appellee responded that he did not recall most of *301 these incidents but did not deny they may have occurred. He explained his failure to mention these episodes by stating he did not recall them. He also stated he gave the Y.A. a history of a.n unrelated work injury to his shoulder because he could not afford private hospitalization and feared he would be denied V.A. treatment for illness or injury related to his work. He also explained that he attempted to obtain a pension for a service connected disability due to an elbow injury sustained in service.
On reconstruction of the third trial day, Appellant attempted to introduce additional V.A. records sent to him by the V.A. after the third trial day. The trial judge disallowed introduction on the ground the records did not form part of the trial day being reconstructed. The trial court did, however, allow their introduction under proffer and also permitted Appellee’s cross-examination with respect thereto. The testimony should have been allowed by the trial court since it was admissible for impeachment purposes. For reasons hereinafter indicated, however, we find the trial court’s rejection of this evidence to be harmless error.
The trial court already had before it numerous V.A. records containing contradictory statements by Appellee regarding his general health prior and subsequent to subject accident and also concerning the origin of his shoulder injury. Despite said evidence, the trial court found that Appellee sustained disabling injuries as a result of the accident. Such a finding is clearly justified by the medical evidence. Undoubtedly the trial court reasoned that notwithstanding Appellee’s illnesses unrelated to the accident, Appellee had been' able to maintain a reasonable work schedule prior to the accident. When Appellant offered the rejected evidence, Appellant’s case of impeachment had already been made; the proffered evidence was cumulative only. The trial court considered the impeachment evidence allowed to be introduced and accepted Appellee’s testimony nevertheless.
Appellant contends the trial court’s evaluation of Appellee’s testimony is unreasonable in view of the record and for this reason, under the manifest error rule, the trial court’s decision should be reversed. Wiley v. Travelers Insurance Company, 300 So.2d 555 (La.App.3d Cir. 1974), and other authorities cited. We agree the rule is applicable under proper circumstances. The facts, however, do not warrant its application in this instance.
We find no basis for declaring the trial court’s determinations unreasonable in view of the record before us. Nor do we find the trial court’s acceptance of Appellee’s testimony to be unreasonable despite impeachment of Appellee’s veracity. The trial court is the judge of credibility based on the entire record, not impeachment evidence alone.
An award of damages for personal injuries lies within the sound discretion of the trial court and is not to be disturbed on appeal save on a showing of abuse of the much discretion vested in the trial court in such matters. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); La.C.C. Article 1934(3). Finding no such abuse in this instance, the award must stand.
The judgment is affirmed at Appellant’s cost.
Affirmed.